# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| Mary Yearwood,<br><br>              Plaintiff,<br>v.<br><br>San Antonio Housing Authority,<br><br>              Defendant. | Case No.: 5:20-cv-00709<br><br>**ORIGINAL COMPLAINT FOR:**<br>Violations of False Claims Act, 31 U.S.C. § 3730(h) and Wrongful Termination<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Mary Yearwood files this Original Complaint against San Antonio Housing Authority ("SAHA" or "Defendant"), and alleges as follows:

### I.   INTRODUCTION

1. Plaintiff, Mary Yearwood brings this action pursuant to the retaliation provisions of the federal False Claims Act and the *Sabine Pilot* doctrine. This action concerns Plaintiff's investigations and efforts to stop false and fraudulent statements, reports and claims for payment that Defendant routinely and intentionally submitted to federal housing programs, and Plaintiff's refusal to commit illegal acts.

2. Plaintiff seeks damages as a result of Defendant's retaliation against her in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. §§ 3730(h), and the *Sabine Pilot* doctrine.

### II.   THE PARTIES

3. Plaintiff Mary Yearwood, at all relevant times, was a citizen of Texas, residing in San Antonio, Bexar County, Texas.

4.      San Antonio Housing Authority is a domestic quasi-governmental corporation that can be served via its registered agent for service, San Antonio Housing Authority, 818 S. Flores, San Antonio, TX 78204.

### III.    JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

6.      This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendant because the Defendant can be found in, resides in, and/or has transacted business within this Court's jurisdiction, and some of the acts giving rise to Plaintiff's claims occurred within this district.

7.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a) because the Defendant resides in or transacts business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district.

8.      Plaintiff is familiar with Defendant's retaliatory practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

### IV.    THE FALSE CLAIMS ACT

9.       The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). The FCA establishes treble damages liability for an individual or entity that: "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(l)(A); or "knowingly makes, uses, or causes to be made or used, a false record or

1

statement material to a false or fraudulent claim, *id.* § 3729(a)(l)(B). For purposes of the False Claims Act, "knowing" and "knowingly" (A) mean that a person, with respect to information-- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

## V.   THE PLAINTIFF

10. Plaintiff began working for SAHA on May 6, 2019 as SAHA's Development Manager as a professional nonprofit fundraiser. Her salary was $67,057.12 per year, plus extensive and valuable benefits including healthcare, dental, vision, FSA plan, life insurance, short- and long-term disability insurance, vacation, 13 holidays, deferred compensation account, retirement account with a 7% match contributed by SAHA ($4,693.99 value of SAHA contribution alone), tuition reimbursement, and professional development fees, valued at approximately $26,823 per year.

11. She was terminated on September 30, 2019, in retaliation for opposing SAHA's fraudulent conduct in connection with HUD grants, for refusing to commit illegal acts in connection with HUD grants, opposing SAHA's fraudulent conduct related to rules for IRS tax-exempt organizations (the SAHA 501(c)-3 nonprofit entity Education Investment Foundation ("EIF")), and refusing to commit illegal acts in connection with the EIF.

## VI.   THE DEFENDANT

12. Defendant, SAHA employs more than 525 people and has an operating budget of $186 million and real estate assets valued at more than $500 million.

13. SAHA is recognized by the U.S. Department of Housing and Urban Development ("HUD") as a Public Housing Agency ("PHA"). In 2009, HUD gave SAHA the Moving to Work ("MTW") designation.

## VII. SAHA'S RECEIPT OF FEDERAL FUNDS

14. SAHA is a Public Housing Agency ("PHA"), which is required by federal law and regulations to submit certified documentation truthfully representing various facts about its use of the funds, including the MTW funds, it receives from the United States Government via HUD.

15. As a MTW PHA, SAHA was required to sign a MTW Standard agreement with HUD. The 2006 MTW Standard Agreement incorporated elements of HUD's original MTW Agreements with SAHA, but contained more rigorous and consistent reporting requirements. The initial term of the Standard Agreement was to the end of each agency's 2018 fiscal year. In 2016 and at the direction of Congress, HUD extended the term of the Standard Agreement to the end of each agency's 2028 fiscal year.

16. SAHA submitted its MTW Plan for 2020 to HUD on August 13, 2019.

17. SAHA submitted its Annual Report for Fiscal Year 2018-2019 to HUD on September 30, 2019, signed by SAHA's president and CEO, David Nisivoccia.

18. As an MTW PHA, SAHA submitted information in a Financial Data Schedule (FDS) format through the Financial Assessment System – PHA (FASPHA). As a block grant agency, SAHA combined Public Housing (PH), Housing Choice Voucher (HCV), and Capital Fund Program (CFP) funds into a single fund.

19. Sources of MTW Funds included various types of funding from HUD including: HCV Block Grant funding, PH Operating Subsidy, and PH CFP (including DDTF) Grants from HUD.

## VIII. PLAINTIFF'S JOB PERFORMANCE

20. Before Plaintiff began opposing Defendant's fraud, she was recognized as an exemplary employee. Defendant gave her additional responsibilities, and consistently praised her performance.

21. In August 2019, Plaintiff got a positive 90-day review that was finalized and filed on August 27, 2019. She received no warnings, discipline, performance-improvement plans, or other negative feedback.

## IX. SAHA'S SUBMISSION OF FALSE CLAIMS

22. Shortly after beginning her employment at SAHA, Plaintiff learned that SAHA routinely submitted false claims and statements to HUD in order to continue obtaining federal funding.

23. Plaintiff's supervisor was SAHA's Director of Policy and Planning, Richard Milk.

24. Adrian Lopez was SAHA's Director of Community Development Initiative ("CDI"), and thus had a lead role in overseeing SAHA's spending of federal funds.

25. Plaintiff saw that Lopez was responsible for SAHA making false representations to HUD about SAHA's use of federal funds. Lopez was improperly using MTW funds from HUD and making false representations to HUD in conjunction with requests for additional HUD Funding.

26. Plaintiff complained about Lopez's conduct to Milk, but Milk told Plaintiff that he had a close personal friendship with Lopez and would not take any steps to stop the misconduct.

27. Plaintiff learned that Lopez had a history of cheating the federal government and in the past had received a call from federal authorities ordering him to repay improperly obtained federal funds or be indicted. Lopez paid back the funds.

28. Plaintiff learned that Milk was complicit in the fraud. When Plaintiff was tasked with drafting documents to be presented to HUD, which were required for SAHA to continue receiving HUD funding, Plaintiff sought to obtain the required information from SAHA employees. When she had difficulty obtaining the required information, Milk told her to "make it up." In other words, Milk instructed Plaintiff to fabricate false information in a document that would be submitted in a sworn document to HUD for purposes of obtaining federal funds. Plaintiff refused to sign her name on any document submitted to HUD that included fabricated information.

29. Defendant operated in blatant violation of multiple requirements of the grant as follows:

30. Defendant falsely represented that it had non-federal matching funds for its HUD-funded ROSS program, while those funds were actually MTW funds already awarded by HUD. Defendant claimed that those funds came from the Education Investment Foundation (EIF), SAHA's nonprofit entity, which had been in a severe and growing deficit for several years.

31. Plaintiff witnessed that throughout her employment by Defendant in May through September of 2019, Defendant knowingly submitted or caused the submission of false claims to the Government and created false records and statements to receive reimbursement from the

Government in connection with SAHA's federal grants. Plaintiff learned that this conduct predated her employment and continued after Plaintiff was terminated.

### X.   PLAINTIFF'S OPPOSITION OF SAHA'S FCA VIOLATIONS.

32.   Plaintiff repeatedly complained to management about SAHA's continuing violations of the False Claims Act.

33.   Plaintiff complained about the fraud to multiple directors within Defendant including: Richard Milk, Director of Policy and Planning; Diego Ibarra, Director of Security (whom she believed was/is a law enforcement officer); Aiyana Longoria, Director of Internal Audit; Diana Fiedler, Director of Finance; and Thomas Roth, Director of Asset Management.

34.   Plaintiff made several attempts to schedule meetings with people in Defendant's HR Department to report fraud claims and concerns, including Janie Rodriguez (Director of HR), and Linda Rodriguez. Those meeting requests with the HR department were ignored.

**A.   Forms Submitted by Defendant to Obtain Payment from Government Programs**

35.   The forms used by Defendant to obtain HUD grant funds included Form 50900, Form SF 424, Form 2991, and Form 52768.

**B.   Defendant submitted false information to HUD multiple times**

36.   Defendant fabricated matching funds in its 2018 ROSS grant application with HUD.[1]

---

[1] Plaintiff has documents showing MTW funds usage for FY2019 and 2018 ROSS request showing matching funds that denote use of $385,350 from Education Investment Foundation and ConnectHome (which are already funded through MTW). Also, the ROSS application states that the value of EIF education scholarships is $241,350 but the MTW report states only approximately $30,000 was given in scholarships.

37. Defendant fabricated information in its MTW report, as discussed below.

38. Defendant fabrication information in multiple HUD Form 50900 submissions.[2]

39. Defendant fabricated information in HUD Form 2991.

40. Defendant fabricated information in HUD Form SF 424, which is part of the ROSS Grant form.

41. Defendant fabricated information in multiple HUD Form 52768 submissions, as part of the ROSS Grant form.

## XI.   RETALIATION

42. Once Plaintiff complained about the fraudulent practices to her supervisor and other department directors, Defendant's treatment of her changed and Defendant began retaliating against her.

43. SAHA knew that Plaintiff was opposing its FCA violations and began to retaliate against her. First SAHA terminated Plaintiff's access to the CDI department's Google drive files, which contained documentation related to SAHA's HUD funding.

44. In late July/early August 2019, Plaintiff was removed from the Golf Tournament Committee by her supervisor, even though this committee was in charge of the annual fundraising event and Plaintiff was hired to conduct fundraising events as part of her job duties. Plaintiff was also denied the opportunity to serve as a volunteer at the golf tournament event.

45. On August 22, 2019, Mr. Milk informed Plaintiff that she would not be involved in the United Way fundraising campaign, even though he had previously told her that she would

---

[2] SAHA failed to hold the required public hearings. Many resident-only or staff-only meetings were falsely listed as "public hearings" when the public was excluded. Accordingly, there has not been the required amount of days (15) between the public hearing and the board of commissioners' votes to approve MTW reports/plans.

7

be involved in said campaign and her job description stated the same. Plaintiff deemed this to be retaliatory harassment.

46. During the process of her 90-day employee performance review, Plaintiff received a point deduction in the "Client Focus" goal. On August 29, she sought more information from Mr. Milk as to exactly what she had done wrong to cause the point deduction, so she could improve. Mr. Milk then admitted that Mr. Lopez had influenced him to make this point deduction, though Mr. Milk admitted that he didn't know of anything she had done wrong, that he had not received any reports from Mr. Lopez or anyone else of poor client focus, and that she probably had not done anything wrong.

47. On August 15, 2019, Mr. Milk instructed Plaintiff to direct her efforts away from fundraising and towards grant writing. On August 21, 2019, Jo Ana Alvarado, Director of Innovative Technologies, sent Plaintiff a harassing email. This email wrongly scolded Plaintiff for recommending fundraising software for the agency.

48. SAHA terminated Plaintiff's access to documents in the Google drive, which contained documentation related to SAHA's HUD funding and EIF records.

49. On September 9, 2019, Plaintiff reported the numerous instances of harassment to Mr. Milk, stating that she was being bullied by other directors in the agency, and sought his support. Mr. Milk refused to assist her in this matter.

50. In meetings with Mr. Milk on September 16 and 18, Plaintiff reiterated her numerous concerns with Defendant's fraudulent grant claims and again stated her refusal to be complicit in such schemes.

51. On September 19, 2019, Milk recommended that Plaintiff be terminated. Mr. Milk submitted the paperwork recommending termination to the HR department on September 23, 2019.

52. Plaintiff engaged in protected activity when she investigated and reported the fraudulent nature of Defendant's schemes.

53. Specifically, Plaintiff opposed Defendant's practices described above. Her opposition was memorialized in Plaintiff's personal notes regarding her meetings and conversations with Mr. Milk and numerous other people in positions of power at the agency.

54. Plaintiff's actions were motivated by her good faith belief that Defendant was committing fraud against the United States.

55. Defendant was on notice that Plaintiff was investigating the fraud as evidenced by Plaintiff's multiple conversations and emails with Milk wherein Plaintiff complained about these fraudulent practices. These conversations put Defendant on notice that litigation was a reasonable possibility.

56. Defendant's harassment and eventual termination of Plaintiff was motivated by her protected activity described in this pleading. Her harassment and eventual termination happened directly after the protected activity and her protected activity is the cause of her harassment, unfair treatment and eventual termination, as she was otherwise recognized as doing an excellent job.

57. Defendant's retaliation and discrimination inflicted damages on Plaintiff including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, emotional distress, litigation costs.

## XII.   CAUSES OF ACTION

### Claim 1
### Retaliation – False Claims Act, 31 U.S.C. § 3730(h)

58. Plaintiff re-alleges and incorporates by reference all paragraphs in this pleading.

59. Plaintiff engaged in protected activity when she investigated and reported the fraudulent nature of Defendant's schemes.

60. Specifically, Plaintiff opposed Defendant's practice of intentionally and knowingly submitting false claims and documentation to HUD as described above.

61. Plaintiff's actions were aimed at matters that reasonably could lead to a viable claim under the FCA and/or demonstrated a distinct possibility of FCA litigation.

62. Plaintiff's actions were motivated by her good faith belief that Defendant was committing fraud against the United States.

63. Plaintiff put Defendant on notice that Plaintiff was investigating the fraud as evidenced by the multiple conversations and email exchanges wherein Plaintiff complained about these fraudulent acts and resisted participating in them. These conversations put Defendant on notice that litigation was a reasonable possibility.

64. Defendant first retaliated against Plaintiff by removing her access to the Google drive that contained documents related to SAHA's HUD funding and the nonprofit entity EIF, access to which was necessary to do her job.

65. Defendant consistently punished Plaintiff, treating her more unfavorably that Plaintiff's co-workers who went along with the fraud. Eventually, Defendant retaliated against her by terminating her employment on September 30, 2019.

66. These acts were all in retaliation for protected activities including investigating and opposing fraudulent practices by Defendant in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h).

67. Defendant's harassment and eventual termination of Plaintiff was motivated by her protected activity described in this pleading. Her harassment and eventual termination happened directly after the protected activity and her protected activity is the only possible cause of her harassment and eventual termination, as she was otherwise recognized as doing an excellent job.

68. Defendant's retaliation and discrimination inflicted damages on Plaintiff including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, emotional distress, litigation costs and attorneys' fees, all collectively in an amount to be determined at trial.

69. Pursuant to 31 USC §3730(h)(2), Plaintiff is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial.

### Claim 2
### Wrongful Termination - *Sabine Pilot*

70. Plaintiff re-alleges and incorporates by reference all paragraphs in this pleading.

71. Plaintiff Defendant's termination of Plaintiff violated Texas common law as enunciated in *Sabine Pilot Services, Inc. v. Hauck*, 687 S.W. 2d 733 (Tex. 1985); and *Johnston v. Delmar Distributing Co.*, 776 S.W. 2d 768 (Tex. App.--Corpus Christi 1989, writ denied). An employer cannot take adverse action against a person for refusing to commit an illegal act.

72. Plaintiff was terminated by Defendant for refusing to commit an illegal act. Specifically, Plaintiff was fired for refusing to make false certifications to the federal government for purposes of obtaining HUD grant funds. These acts constitute state and federal crimes (subject to fine, imprisonment, or both).

73. Her refusal to commit an unlawful act was the basis for her termination. As a direct result, Plaintiff has suffered general and special damages.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1. As to the 31 U.S.C. §3730(h) retaliation claim, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, damages for humiliation, mental anguish, and emotional distress, pre and post-judgment interest, litigation costs and attorneys' fees, and any other relief that this Court deems appropriate, all collectively in an amount to be determined at trial;

2. As to the Sabine Pilot claim, all damages discussed above, plus punitive damages;

3. Prejudgment interest;

4. All costs incurred in bringing this action;

5. An award to Plaintiff pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

6.Such other relief as the Court deems just and equitable.

### XIII.JURY DEMAND

Plaintiff hereby demands a jury trial on all issues triable to a jury.

Dated:  June 17, 2020.

By:/s/ Cory S. Fein
Cory S. Fein
Cory Fein Law Firm
712 Main St., Suite 800
Houston, TX  77002
cory@coryfeinlaw.com
(281) 254-7717 (phone)
(530) 748-0601 (fax)

**ATTORNEY FOR PLAINTIFF**